Billy N. COOK, et al., Plaintiffs,

v.

Pat H. LUCKETT, Jr., et al., Defendants.

CANTON BRANCH, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., Plaintiffs,

v.

Don LANE, et al., Defendants.

Monzell STOWERS, et al., Plaintiffs,

v.

SCOTT COUNTY BOARD OF SUPERVISORS, et al., Defendants.

Jessie BUIE, et al., Plaintiffs,

v.

The LINCOLN COUNTY BOARD OF SUPERVISORS, et al., Defendants.

Barney SCHOBY, et al., Plaintiffs,

v.

The ADAMS COUNTY BOARD OF SUPERVISORS, et al., Defendants.

Jessie PENDLETON, et al., Plaintiffs,

v.

Warren E. HOOD, et al., Defendants.

Civ. A. Nos. J83-0381(B), J83-0391, J83-0564(B), J83-0560(B), W83-0095(B) and J83-0519(B).

United States District Court,
S.D. Mississippi,
Jackson Division.

Oct. 12, 1983.

John W. Christopher, Stanley F. Stater, III, Christopher & Stater, Edward Blackmon, Jr., Canton, Miss., Carroll Rhodes, Hazlehurst, Miss., Alison Steiner, Elliott Andalman, Hattiesburg, Miss., Jere Krakoff, William L. Robinson, Frank R. Parker, Patricia M. Hanrahan, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

Tom Lee, Hattiesburg, Miss., Hubbard T. Saunders, IV, Jackson, Miss., Joe R. Fancher, Jr., G. Milton Case, Canton, Miss., for defendants.

## MEMORANDUM OPINION

BARBOUR, District Judge.

In the months prior to the primary elections held on August 2, 1983, five suits were filed complaining of malapportionment in the existing districting schemes in force in the five counties which were involved. In each of the five cases the Motions for Preliminary Injunction were held as quickly as possible and after due consideration and findings by the Court as set forth herein, the Court granted the Motions for Preliminary Injunctions in each of the cases and subsequently supplemented its order to outline a method of expedited discovery whereby evidentiary hearings could be held for the formulation of constitutionally sound plans.[1] The following opinion outlines the specific factual circumstances found to exist in each case. Because the law which applies to each of these cases is constant, only one discussion of the applicable legal principles will be necessary. The conclusions which this Court has drawn with reference to each individual case will be considered following a discussion of the applicable law.

To avoid repetition of facts which are uniform in each case, this Court begins its journey narrating those common areas before outlining the facts which were found to be true by this Court that are specific to each case. All five suits involve the board of supervisors' districts[2] which were alleged to be unconstitutionally malapportioned. Each of the suits requested preliminary injunctions against the holding of primary elections under the existing appor-

---

1. The five counties involved are Madison, Adams, Copiah, Lincoln and Scott. The supplemental order governing expedited discovery set forth the time periods in which all parties in each of the suits would be required to exchange discovery material and answer such discovery request.

2. Each county in Mississippi is divided into five districts from which the members of the board of supervisors are elected. The districts are required to be drawn "with due regard to equality of population" and the board is charged with the responsibility of changing the boundaries of the counties' districts. Miss.Code Ann. § 19–3–1 (Supp.1982)

tionment scheme. All of the defendant boards of supervisors admitted, either in their answer, in their briefs, or at the hearing, that they were aware that the districts of their county were malapportioned. Furthermore, the 1980 census upon which the figures constituting malapportionment are based had been available to the boards of supervisors since the summer of 1981. None of the counties involved in these five actions had submitted plans for redistricting the county to the Attorney General of the United States pursuant to Section 5 of the Voting Rights Act of 1965 and successfully had their plan pre-cleared. Neither had any county brought suit in the District of Columbia pursuant to Section 5 to obtain judicial pre-clearance of their proposed plan. Consequently, even though some of the counties may have attempted pre-clearance, none had done so successfully and some had not even attempted at all.

## MADISON COUNTY

On June 6, 1983, the first of two suits were filed requesting a preliminary injunction against the holding of elections in Madison County. The second suit was filed on June 13, 1983.[3] On Motion of the Defendants these suits were consolidated on July 7, 1983.[4]

The Defendants have admitted the allegation of the Plaintiffs that the Supervisor Districts of Madison County are constitutionally malapportioned. Initially, both Plaintiffs requested that this Court grant a preliminary injunction. Subsequently, the NAACP Plaintiffs withdrew their motion for preliminary injunction but renewed that motion at the hearing.

Both the NAACP and the Cook Plaintiffs allege in their complaints and the Defend-

ants admit in their answer that the following figures are the correct populations of each district:

| District | Population |
|---|---|
| 1 | 16,963 |
| 2 | 3,823 |
| 3 | 14,914 |
| 4 | 3,744 |
| 5 | 2,169 |

The Plaintiffs and the Defendants disagree as to the percentage of variance from norm for each of the Supervisor Districts as presently constituted as follows:

| District | Cook Plaintiffs | NAACP Plaintiffs | Defendants |
|---|---|---|---|
| 1 | + 104.7% | + 103.83% | + 103.8% |
| 2 | − 54.06% | − 54.7% | − 54.06% |
| 3 | + 79.2% | + 79.21% | + 79.2% |
| 4 | − 55.01% | − 55.1% | − 55.02% |
| 5 | − 73.93% | − 73.93% | − 73.9% |

Thus, the total deviation would be 177.7%, 177.76% or 178.63% depending upon the set of figures used.

The defendants further admit that the optimum population for each district according to the 1980 Federal Decennial Census is 8,323 persons. The NAACP disagrees with this figure alleging the ideal population norm to be 8,322 persons for each Supervisory District.

Not only are the Districts of Madison County grossly malapportioned as is shown above, but furthermore, the Madison County Board of Supervisors has made no effort to reapportion the County following the 1980 census according to their duty under state law. *Miss. Code Ann.* § 19–3–1 (Supp.1982). The information contained in the 1980 census has been available to the Board of Supervisors since approximately July of 1981. No legitimate reason was offered to justify the malapportionment of the districts.

**3.** The plaintiffs in the first suit are Billy N. Cook and Robert Carter. Both are alleged to be resident citizens of Madison County, Mississippi, and registered to vote within their respective districts. Mr. Cook resides in District 3 and Mr. Carter resides in District 1 of Madison County, Mississippi.

The plaintiffs in the second suit are the Canton Branch National Association for the Advancement of Colored People, and other individuals. For convenience these two sets of plaintiffs will

be referred to as the Cook Plaintiffs (in the first suit) and the NAACP Plaintiffs (in the second suit).

**4.** Both actions named the Board of Supervisors, the Circuit Clerk, and the Election Commissioners of Madison County as Defendants. The Democratic and Republican Executive Committees of Madison County, Mississippi, were added as Defendants by an amended complaint.

## ADAMS COUNTY

On June 6, 1983, the complaint was filed alleging that the Supervisor Districts of Adams County, Mississippi, were malapportioned and did not meet the one-person, one-vote requirements of the Constitution. This Court held an evidentiary hearing on July 20, 1983, for the determination of whether or not the upcoming elections should be enjoined. The complaint alleged and it was substantially admitted by the Defendants that the existing apportionment plan impermissibly violated the constitutional requirements. The population for each district was alleged and substantially admitted to be as follows:

| District | Population (1980 census) | Population Variance From Norm | Variance Percent From Norm |
|---|---|---|---|
| 1 | 6,720 | 887 | − 11.66 |
| 2 | 8,357 | 750 | + 9.86 |
| 3 | 7,336 | 271 | − 3.56 |
| 4 | 6,673 | 934 | − 12.28 |
| 5 | 8,949 | 1,342 | + 17.64 |

The total deviation was alleged to be 29.92 percent. No legitimate reason was offered to justify the malapportionment of the districts. At the hearing the Defendants admitted that a preliminary injunction preventing the election for supervisors should issue.

The Adams County Board of Supervisors had submitted a plan to the Justice Department for pre-clearance under Section 5 of the Voting Rights Act in March of 1983. The Justice Department interposed an objection. However, the County was not attempting to implement this plan. Consequently, it was determined that there was no need for a three judge court because the injunction was sought on the basis of the unconstitutionality of the existing apportionment plan.

The Board of Supervisors failed to timely pursue their responsibility to redistrict Adams County subsequent to the 1980 census.

## COPIAH COUNTY

Suit was filed in Copiah County on July 8, 1983, alleging the existence of an unconstitutional apportionment scheme in Copiah County. The answer of the Defendants admits the unconstitutionality of the apportionment scheme existing in Copiah County. The population of each of the Districts of Copiah County according to the 1980 census was alleged and substantially admitted to be as follows:

| District | Population (1980 census) | Population Variance From Norm | Percent Variance From Norm |
|---|---|---|---|
| 1 | 5,811 | 510 | + 9.62 |
| 2 | 5,423 | 122 | + 2.30 |
| 3 | 4,872 | 429 | − 8.09 |
| 4 | 4,737 | 564 | − 10.64 |
| 5 | 5,660 | 359 | + 6.77 |

The total deviation according to these figures is 20.26 percent. No legitimate reason was offered to justify the malapportionment of the districts.

The Board of Supervisors of Copiah County had completed submissions of redistricting plans to the Justice Department; however, both submissions were objected to prior to the hearing of the Plaintiff's Motion for an Injunction. The initial submission to the Justice Department was not completed until February 10, 1983. The Board of Supervisors failed to timely pursue their responsibility to redistrict Copiah County subsequent to the 1980 census.

## LINCOLN COUNTY

Suit was filed against the Lincoln County Board of Supervisors on July 25, 1983, requesting an injunction against the holding of elections under the existing apportionment plan. According to the 1980 census the population of each district and the deviation from the norm is reflected as follows:

| District | Population (1980 Census) | Population Variance From Norm | Percent Variance From Norm |
|---|---|---|---|
| 1 | 5,358 | 677 | − 11.21 |
| 2 | 6,527 | 492 | + 8.15 |
| 3 | 5,594 | 441 | − 7.30 |
| 4 | 6,095 | 60 | + .99 |
| 5 | 6,600 | 565 | + 9.36 |

The total deviation according to these figures is 20.57 percent. The Board of Supervisors had submitted a plan on January 27, 1983, to which a timely objection was interposed by the Justice Department. Due to this objection the proposed plan was

unenforceable and as shown by the 1980 census figures, the existing plan did not meet with the constitutional requirements of one person-one vote.

The Defendants admit the population figures are correct and offer no legitimate reason for the existence of the disparity between the districts of Lincoln County.

The Board of Supervisors failed to timely pursue their responsibility to redistrict Lincoln County subsequent to the 1980 census.

### SCOTT COUNTY

On July 27, 1983, suit was filed against the Scott County Board of Supervisors alleging that the existing supervisory districts were malapportioned and requesting a preliminary injunction of the upcoming elections. The 1980 census figures of population by district are as follows:

| District | Population (1980 Census) | Population Variance From Norm | Percent Variance From Norm |
|---|---|---|---|
| 1 | 4,820 | − 91 | − 1.85 |
| 2 | 4,590 | − 321 | − 6.53 |
| 3 | 4,630 | − 281 | − 5.72 |
| 4 | 4,592 | + 41 | + .83 |
| 5 | 5,564 | + 653 | + 13.29 |

These deviations from the norm constitute a total deviation of 19.82 percent. The county has offered no legitimate reason for the existence of the malapportionment of the districts.

The Board of Supervisors of Scott County did submit a proposed plan to the Justice Department in January of 1983. The Justice Department interposed a timely objection to this plan. Another submission by the Board of Supervisors was made at the time of the hearing on the preliminary injunction. However, no response from the Justice Department had been received at that time and the time for the Attorney General to file objections had not passed.

The Board of Supervisors failed to timely pursue their responsibility to redistrict Scott County subsequent to the 1980 census.

### CONCLUSIONS OF LAW

Since the Supreme Court entered the "political thicket" of legislative apportionment in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) where the constitutional integrity of an apportionment scheme under the Fourteenth Amendment's guarantee of equal protection was held to be justiciable, there has been an exploding body of law which has outlined the requirements and obligations of the Federal Courts when faced with a bona fide challenge to apportionment schemes. The Supreme Court stated in its landmark case of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964):

> The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote. The complexions of societies and the civilizations change, often with amazing rapidity. A nation once primarily rural in character becomes predominately urban. Representative schemes once fair and equitable become archaic and outdated. But the basic principle of representative government remains and must remain unchanged—the weight of a citizen's vote cannot be made to depend on where he lives.

*Id.* at 567, 84 S.Ct. at 1384, (footnotes omitted).

The principle announced in *Reynolds v. Sims* has been applied to units of local government, *Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); *Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). Likewise, this principle has been applied to school boards, *Panior v. Iberville Parish School Board*, 498 F.2d 1232 (5th Cir.1974), counties, *Kirksey v. Board of Supervisors of Hinds County*, 554 F.2d 139 (5th Cir.) (en banc) *cert. denied* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977); and other local bodies, *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1158 (5th Cir.1981).

■ Clearly the Board of Supervisors of each of these five counties is a body of local government which exercises general governmental power over the districts from

484

which they are elected requiring them to meet the one-person, one-vote requirement of the Constitution.

Although each of the five counties represents a distinct set of facts, there are common threads which place each in the same situation. None of the counties has actively pursued its obligation under the laws of Mississippi and the Constitution of the United States to reapportion their districts so that the elections scheduled for 1983 would be held under a sound districting scheme. The Boards of Supervisors' abdication of their responsibility to redistrict their counties has placed this court in the position of either allowing elections to go forward under an unconstitutional scheme of apportionment or enjoining elections, admittedly a drastic remedy. This court is mindful of the Supreme Court's directive that,

> ... When those with legislative responsibilities do not respond *or the eminence of a state election makes it impractical for them to do so, it becomes the unwelcome obligation, Conner v. Finch,* supra 431 U.S. [407] at 415, 97 S.Ct. [1828] at 1833 [52 L.Ed.2d 465], of the Federal Court to devise and impose a reapportionment plan pending later legislative action.

*Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978) (emphasis added).

None of the five counties under consideration here submitted plans to the Justice Department in compliance with Section 5 of the Voting Rights Act of 1965 as codified at 42 U.S.C.A. § 1973c until 1983. This on its face means that there is a limited time in which the counties may respond to potential objections by the Justice Department to plans submitted. Indeed, Madison County made no submissions whatsoever to the Justice Department.

In *Watson v. Commissioners Court of Harrison County,* 616 F.2d 105 (5th Cir. 1980) (per curiam) the United States Court of Appeals for the Fifth Circuit held that the district court improperly allowed the primary elections to go forward based on an apportionment plan which all parties agreed was unconstitutional. The trial judge in *Watson* had held that it would be useless to hear the case when the 1980 census would establish many of the facts needed. The Fifth Circuit observed that the effect of this order was to allow the election to be held under the old plan. *Id.* at 106.

Before this Court today are counties who have had the 1980 census for some time, at least two years, and for the most part have failed to make a submission to the Justice Department as required by Section 5 of the Voting Rights Act until early in this year, an election year. The Fifth Circuit stated in *Watson:*

> In the peculiar circumstances of this case we cannot uphold the Court's delaying reapportionment until after the 1980 census.... If an election were held as planned it would be based on the 1965 reapportionment plan, which all the parties and the Court seem to agree is unconstitutional.... A primary election is scheduled for May 3, 1980. Holding it under a plan based on the 1960 census, updated to 1965, would further voting dilution and would subject the people of Harrison County to four more years of government by commissioners elected under an outdated, inequitable, unconstitutional plan.

*Id.* at 107.

This clear directive from the Fifth Circuit obviously applies in this case. *See Stokes v. Warren County Election Commission,* No. J79–0425(C) (S.D.Miss. Sept. 20, 1979) (Clark, J., sitting as District Judge by designation) (order granting preliminary injunction).

■ The four factors which should be considered in deciding whether a preliminary injunction should issue are all satisfied in the five cases before this Court. Firstly, the irreparable injury inherent in perpetuating voter dilution is obviously present in each of the five counties where some districts are over-represented while others are under-represented.

Secondly, the balancing of the injury to the plaintiffs against the harm that the injunctive relief would inflict on the defendants dictates that this, too, be decided in favor of granting an injunction. The only substantial harm to the defendants is the expenditure of funds which may be required by the necessity of holding a special election. However, the blame for this expenditure should be placed on the Boards of Supervisors for their failures to fulfill their statutory duties. The expense which will be involved is neither onerous nor overburdensome considering the equities involved.

Thirdly, the plaintiffs in each action have shown without a doubt that they will succeed on the merits by the fact that the defendants have offered no reason for the malapportionment of the districts which could be considered legitimate. *See Karcher v. Daggett,* —— U.S. ——, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) (must show that each variance between districts was necessary to achieve some legitimate goal).

Fourthly, the public interest will not be adversely affected by the granting of this injunction. The public interest must be concerned with the integrity of our representative form of government. This Court's issuance of an injunction will only prevent the election from being held as scheduled; however, it is not contemplated that the present office holders will sit more than a few weeks, if at all, beyond their elected tenure. Indeed, this Court proposes to see that constitutional districts are decided upon and put into effect as soon as is practical, assuring the people of these counties of the opportunity to elect supervisors under a constitutional scheme.

## CONCLUSION

It has been determined by this Court that the boundaries which have existed in the five counties were unconstitutional in that they were grossly malapportioned and that an injunction must issue prohibiting the holding of elections for supervisors. This opinion is written subsequent to the actual issuance of the injunctions in order that the foundation in fact and law may be more fully explained and understood.